1    **TEKER TORRES & TEKER, P.C.**
2    130 Aspinall Avenue Suite 2A
     Hagåtña, Guam 96910
3    Telephone:  671-477-9891
     Facsimile:  671-472-2601
4

5
     Attorneys for Defendants,
6    GIRARDI | KEESE, a general partnership, and GRAHAM LIPPSMITH

7

8

9                    UNITED STATES DISTRICT COURT

10                          DISTRICT OF GUAM

11

12   DAVID J. LUJAN,                    )
                                        )   CASE NO. **09-00017**
13            Plaintiff,                )
                                        )   [Superior Court Action No. CV0776-09]
14   vs.                                )
                                        )
15                                      )
     GIRARDI | KEESE, a general partnership, )
16   GRAHAM LIPPSMITH, an individual, the )
     J.L.H. TRUST, a Cook Islands Trust, KEITH)
17   A. WAIBEL, an individual and as a Trustee )   **NOTICE OF REMOVAL**
     of the J.L.H. TRUST, ROGER SLATER, an )
18   individual, GRANT THORNTON, a Guam )
     entity, and DOES 1 through 20,      )
19                                      )
                                        )
20            Defendants.               )
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24                                      )
                                        )
25                                      )
                                        )
26                                      )
                                        )
27   _____)

28                                    -1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF GUAM AND ALL PARTIES OF RECORD:**

PLEASE TAKE NOTICE that Defendants GIRARDI | KEESE and GRAHAM LIPPSMITH, by and through their undersigned attorneys, hereby remove this action from the Superior Court of Guam ("Guam Superior Court") to the United States District Court for the District of Guam, pursuant to 28 U.S.C. § 1332. In support of this Notice of Removal, Defendants state as follows:

1. Removal is based on diversity jurisdiction pursuant to 28 U.S.C. § 1332, supplemental jurisdiction over state law claims under 28 U.S.C § 1367(a), and fraudulent joinder and egregious misjoinder as detailed in paragraphs 16-26, *infra*.

2. On or about May 11, 2009, Plaintiff David J. Lujan (hereinafter "Plaintiff" or "Lujan") instituted this civil action (the "Guam Action") by filing a complaint in the Superior Court of Guam, Case No. CV 0776-09 (the "Complaint," a true and correct copy of which is attached hereto as Exhibit A. Additionally, a true and correct copy of the Summons to Girardi | Keese is attached hereto as Exhibit B, and a true and correct copy of the Summons to Graham LippSmith is attached hereto as Exhibit C pursuant to 28 U.S.C. §1446(a)). Girardi | Keese and LippSmith allege upon information and belief that said documents are the only pleadings filed with the court as of this date and the only documents served on either Girardi | Keese or LippSmith. No responsive pleadings have as yet been filed by any defendants.

3. On May 12, 2009, Girardi | Keese and Graham LippSmith (the "Girardi Defendants") were served and received copies of the Summons and Complaint. This Notice of Removal is timely under 28 U.S.C. § 1446(b) in that it is being filed within thirty days of May 12, 2009, which is the date that defendants Girardi | Keese and Graham LippSmith were served with the copy of a Summons and the Guam Complaint.

4. The Complaint filed by Plaintiff purports to assert a cause of action against Girardi | Keese and Graham LippSmith for defamation. The defamation cause of action is only asserted against the Girardi Defendants, and none of the other causes of action include either Girardi | Keese or LippSmith.

5. Joinder in the notice of removal is not required by persons named as defendants solely to prevent removal. The Guam Defendants are sham defendants included in the complaint merely to destroy

diversity, and the claims against the other Defendants have no real connection or nexus to the claim against Girardi | Keese and LippSmith. The Girardi Defendants are informed and believe that the consent of the other Defendants in the Guam Complaint is not necessary for this removal because they are either sham defendants or were fraudulently misjoined and the claims against them should be severed from the claim Plaintiff asserts against the other Defendants for the purposes of determining diversity jurisdiction. Notwithstanding the foregoing, all other defendants consent to and join in this removal and will file their "Joinder in Notice of Removal of Action" to this Notice of Removal.

6. The Girardi Defendants reserve any and all objections and defenses, including, without limitation, those afforded them under the Federal Rules of Civil Procedure and any other federal and/or state case or statutory laws, to the maintenance of this action, including, without limitation, objections and defenses to each and every cause of action alleged in the Guam Complaint.

7. Notice of the filing of this Notice of Removal will be promptly served on all parties to this action and filed with the Clerk for Guam Superior Court in accordance with 28 U.S.C. § 1446(d).

## DIVERSITY OF CITIZENSHIP JURISDICTION

8. The Girardi Defendants are informed and believe that Plaintiff is an individual and citizen and resident of Guam. (Complaint ¶ 1).

9. Defendant Girardi | Keese is, and at all relevant times was, a general partnership duly organized and existing under the laws of the State of California, with its principal place of business located in the city of Los Angeles in the State of California.

10. Defendant Graham LippSmith is an individual and citizen of the State of California, and resides in the county of Los Angeles in the State of California.

11. Defendant the J.L.H. Trust (the "Trust") is a trust organized and registered under the law of the Cook Islands.

12. Defendant Keith A. Waibel ("Waibel") is an individual and U.S. citizen and a resident of California, who is and at all relevant times was a Trustee of the J.L.H. Trust.

13. Defendant Roger Slater ("Slater") is an individual and a U.S. citizen and a resident of Guam.

-3-

14. Defendant Grant Thornton is an entity organized and existing under the laws of Guam with its principal place of business in Guam.

15. The Girardi Defendants are informed and believe that the additional Defendants, Does 1 through 20, have not been served with the Summons and Complaint and have not appeared in the action.

## DIVERSITY JURISDICTION

A. THE GUAM DEFENDANTS ARE SHAM DEFENDANTS AND THEIR PRESENCE SHOULD BE IGNORED FOR THE PURPOSES OF DECIDING DIVERSITY

16. Lujan's complaint purports to assert the second and third causes of action, for intentional interference with contract and aiding and abetting, respectively, against Grant Thornton, a Guam entity, and Roger Slater, an individual who resides in Guam (collectively the "Guam defendants"). A cursory examination of the complaint reveals that both are mere sham defendants fraudulently joined for the sole purpose of destroying diversity.

17. When a plaintiff brings a wholly un-meritorious cause of action against a resident defendant in order to destroy diversity jurisdiction, joinder of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is ignored for purposes of determining diversity. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001), quoted in *HVAC Sales, Inc. v. Zurich Am. Ins. Group*, 2005 U.S. Dist. LEXIS 42274 ((N.D. Cal. 2005). This is the "sham defendant" or "fraudulent joinder" doctrine.

18. Lujan's complaint states no factual allegations against either Grant Thornton or Slater. In fact, the only mention of either Grant Thornton or Slater in the factual portion of the complaint is in the form of vague and conclusory allegations in paragraph 36, that "Waibel, Slater and Grant Thornton, in cooperation with Does 1 through 20, developed a scheme to blame Lujan for the poor state of the [J.L.H.] Trust" and that "Waibel, Slater, Grant Thornton and Does 1 through 20 created accountings to try to get Lujan to forego his right to receive payment due under the Retainers and to coerce him to pay millions of dollars to the trust, thereby covering up Waibel's investment losses and saving his lucrative position as Trustee of the Trust." (Complaint ¶ 36).

-4-

19.     The vague and conclusory allegations against Grant Thornton and Slater are insufficient to establish the allegations against either of those Defendants for aiding and abetting or intentional interference with contract. As such, the causes of action against the Guam defendants appear to be wholly unmeritorious and brought only to destroy diversity jurisdiction.

20.     The citizenship of fraudulently joined defendants is not relevant for the purposes of diversity jurisdiction. *United Computer Sys. v. AT&T Info. Sys.,* 298 F.3d 756, 761-62 (9th Cir. 2002), *citing Morris v. Princess Cruises, Inc.,* 236 F.3d 1061, 1067 (9th Cir. 2001); *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir. 1987). Further, joinder in the notice of removal is not required by persons named as defendants solely to prevent removal. The rule of unanimity does not apply to fraudulently joined parties. *See United Computer Systems, Inc. v. AT&T Corp.,* 298 F.3d 756, 762 (9th Cir. 2002), applied in *Sutton v. Davol, Inc.,* 251 F.R.D. 500, 506 (E.D. CA 2008).

21.     As the two Guam based Defendants were fraudulently joined as sham defendants for the purposes of defeating diversity jurisdiction, their presence in the complaint should be ignored for the purposes of defeating diversity and their joinder in this notice is not required.

B.     LUJAN HAS FRAUDULENTLY AND EGREGIOUSLY MISJOINED DEFENDANTS WITH NO REAL CONNECTION OR NEXUS TO HIS PURPORTED DEFAMATION CLAIM AGAINST GRAHAM LIPPSMITH AND GIRARDI | KEESE

22.     The purported defamation claim asserted against Graham LippSmith and Girardi | Keese does not arise from the same factual or legal grounds as the other five causes of action asserted against the other Defendants. Since the claims against the other Defendants have no real connection or nexus to the defamation claim against LippSmith and Girardi | Keese, and arose from an entirely separate set of facts and circumstances, those claims and defendants were fraudulently misjoined and should be severed from the action against LippSmith and Girardi | Keese.

23.     While misjoinder of parties is not ground for dismissal of an action, it is grounds for a district court to drop or add parties on such terms as are just and to sever any claim against a party. *Federal Rule of Civil Procedure 21.* In addition to the authority granted to district courts in FRCP 21, courts in the

Ninth Circuit have recently recognized that the term "fraudulent misjoinder" explains a standard by which courts may gauge whether severance of improperly joined parties is warranted. *See, eg. Greene v. Wyeth*, 344 F. Supp. 2d 674, 684 (Nev. 2004).

24.     The fraudulent misjoinder doctrine ensures that a defendant's right of removal cannot be defeated by the joinder of a resident defendant having no real connection or nexus with the claims against the diverse defendants. *HVAC Sales, Inc. v. Zurich Am. Ins. Group*, 2005 U.S. Dist. LEXIS 42274 (N.D. Cal. 2005), interpreting *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353 (11th Cir. 1996) (abrogated on other grounds at *Cohen v. Office Depot, Inc.*, 204 F.3d at 1072); applied at *Sutton v. Davol, Inc.*, 251 F.R.D. 500, 502 (E.D. Cal. 2008). Where joinder is inappropriate and clearly only for the purposes of manipulating the forum, and the rights of the parties and the interests of justice require, some courts have thus held that severance of claims is appropriate. *Greene v. Wyeth*, 344 F. Supp. 2d 674, 685 (Nev. 2004).

25.     Courts applying the fraudulent misjoinder doctrine are split as to whether the misjoinder alone warrants severance or whether that misjoinder must be egregious to justify severing the Defendants. *Greene v. Wyeth*, 344 F. Supp. 2d at 684.

26.     Lujan has egregiously and fraudulently misjoined non-diverse Defendants who have no real connection or nexus to the claims Lujan purports to assert against diverse Defendants, all in a transparent attempt to destroy diversity jurisdiction. As such, the claim for defamation asserted against LippSmith and Girardi | Keese should be severed from the claims against the other defendants.

C.     <u>AMOUNT IN CONTROVERSY REQUIREMENT</u>

27.     The amount in controversy in this action exceeds $75, 000, exclusive of interest and costs. Diversity jurisdiction exists where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). The amount in controversy for jurisdictional purposes is determined by the amount of damages or the value of the property that is the subject of the action. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).

28.     The test in determining whether the minimum amount in controversy requirement is satisfied when that amount is not named in the state complaint is whether it is "more likely than not" that Plaintiff is

-6-

seeking to recover more than $75,000 in the action exclusive of interest and costs. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403-04 (9th Cir. 1996); *see Singer v. State Farm Mutual Auto. Ins. Co,* 116 F.3d 373, 377 (9th Cir. 1996); *Conrad Assoc. v. Hartford Acc. & Indemn. Co.,* 994 F.Supp. 1196, 1198 (N.D. Cal. 1998) [Jurisdictional minimum may be satisfied by claims for special and general damages, attorneys' fees and punitive damages]; *Simmons v. PCR Technology*, 209 F.Supp.2d 1029, 1031-1034 (N.D. Cal. 2002); *Green v. party City Corp.*, 2002 U.S. Dist. Lexis 775 *9 (C.D. Cal. 2002) [Jurisdictional amount in controversy was satisfied by claim for punitive damages in class action for alleged overtime violations]. This requirement is clearly satisfied based on the allegations against the Girardi Defendants in the Complaint.

29. Lujan alleges that he is "one of the most successful trial lawyers in Guam" and "one of the top criminal defense attorneys in Guam and enjoys an excellent reputation as a respected member of the bar, the legal community, and the community at large" (Complaint, ¶ 13). Lujan further alleges that statements allegedly made by LippSmith "generally injured Lujan's reputation in his trade, business and profession" (Complaint, ¶ 45) and "the effects [of the alleged statements made by LippSmith] were felt by Lujan in Guam" (Complaint ¶ 43) because the alleged statements "clearly expose Lujan to hatred, contempt, ridicule and obloquy because they charge Lujan with dishonesty" (Complaint ¶ 46).

30. As a result of LippSmith's alleged statements, Lujan claims he is entitled to general, punitive and exemplary damages from LippSmith and Girardi | Keese (Complaint ¶¶ 45, 48, 50, 51).

31. While the accuracy of Lujan's depiction of himself and Lujan's description of the actions of LippSmith and Girardi | Keese may be disputed elsewhere, Lujan's allegations in the complaint clearly show Lujan believes his reputation is very valuable and that the impeccability of that reputation has suffered devastating injuries from the alleged conduct.

32. From Lujan's assertions that he is one of the most successful trial and criminal defense lawyers in Guam, with multiple multi-million dollar civil verdicts and settlements, it can be inferred that any damage to his reputation is costly. Thus, under the standard discussed in *Sanchez v. Monumental Life Ins. Co., supra.* 102 F.3d at 404, it is "more likely than not" that the amount in controversy for Lujan's alleged defamation claim against LippSmith and Girardi | Keese exceeds $75,000.

-7-

33.     Accordingly, the Girardi Defendants are informed and believe that this United States District Court has proper jurisdiction based upon diversity of citizenship.

## VENUE

34.     This is a suit of a wholly civil nature brought in a Guam court. The action is pending in Guam, accordingly, Title 28 United States Code §§ 84(c) and 1332, the United States District Court in Guam is the proper forum for removal.

WHEREFORE, Defendants Girardi | Keese and Graham LippSmith pray that the above-referenced action now pending in Guam Superior Court, Case No. CV 0776-09, be removed from that Court to this United States District Court.

DATED: June 2, 2009

**TEKER TORRES & TEKER, P.C.**

BY:
JOSEPH C. RAZZANO, ESQ.
Attorneys for Defendants
GRAHAM LIPPSMITH
GIRARDI | KEESE

-8-

# EXHIBIT
# "A"

1  **EDUARDO A. CALVO, ESQ.**
2  **RODNEY J. JACOB, ESQ.**
   **CALVO & CLARK, LLP**
3  Attorneys at Law
   259 Martyr Street, Suite 100
4  Hagåtña, Guam 96910
   Telephone No.: (671) 646-9355
5  Facsimile No.: (671) 646-9403

6

7  *Attorneys for Plaintiff*
   **DAVID J. LUJAN**

8

9              **IN THE SUPERIOR COURT OF GUAM**

10

11 DAVID J. LUJAN,                        Civil Case No. **CV 0776-09**

12        Plaintiff,

13     v.                                 **COMPLAINT FOR DAMAGES FOR
                                          DEFAMATION, INTENTIONAL
14 GIRARDI | KEESE, a general partnership, INTERFERENCE WITH CONTRACT,
   GRAHAM LIPPSMITH, an individual, the   AIDING AND ABETTING,
15 J.L.H. TRUST, a Cook Islands Trust,    CONTRIBUTION, EQUITABLE
   KEITH A. WAIBEL, an individual and as a INDEMNITY AND BREACH OF
16 Trustee of the J.L.H TRUST, ROGER      CONTRACT
   SLATER, an individual, GRANT
17 THORNTON, a Guam entity, and DOES 1    **Plaintiff Demands a Jury Trial**
   through 20,
18
         Defendants.
19

20

21

22

23

24

25

26

27

28

**COMPLAINT**
{G0041387.DOC;2}

SUPERIOR COURT

2009 MAY 11 PM 5: 27

CLERK OF COURT
BY:_____

Comes Now Plaintiff David J. Lujan, by and through the undersigned counsel, Calvo & Clark, LLP, for his Complaint against Defendants Girardi | Keese, Graham LippSmith, Keith A. Waibel, the J.L.H. Trust, Roger Slater, Grant Thornton and Does 1 through 20, and alleges as follows:

## PARTIES

1.     Plaintiff David J. Lujan is an individual and a citizen and resident of Guam.

2.     Defendant Girardi | Keese ("the Girardi firm") is a law partnership formed under the laws of the State of California with its principal place of business in Los Angeles, California.   The Girardi firm currently represents Junior Larry Hillbroom ("Junior") in an action against Plaintiff in the United States District Court for the Central District of California (the "California Action").

3.     Defendant Graham LippSmith is an individual and a citizen of the State of California. Defendant LippSmith is an attorney employed by the Girardi firm and at all times mentioned in this Complaint, unless otherwise stated, defendant LippSmith was the agent, servant or employee of the Girardi firm and in doing the things alleged in this Complaint was acting within the course and scope of that agency, employment or representation, and with the knowledge, consent, ratification or approval of the Girardi firm.

4.     Defendant the J.L.H. Trust (the "Trust") is a trust organized and registered under the law of the Cook Islands.

5.     Defendant Keith A. Waibel ("Waibel") is an individual and a U.S. citizen and a resident of California.   At all relevant times, Waibel was and continues to be a Trustee of the Trust. The J.L.H. Trust was settled on April 11, 1999 by Junior to act as the recipient of distributions from the estate of his biological father, Larry L. Hillblom.   Waibel has served as a Trustee of the Trust since the Trust was settled.   Waibel is sued herein in his individual capacity and as a Trustee of the J.L.H. Trust.

COMPLAINT

6.    Roger Slater ("Slater") is an individual and a U.S. citizen and resident of Guam.

7.    Grant Thornton is an entity organized and existing under the laws of Guam with its principal place of business in Guam.  Slater is a member or employee of Grant Thornton.

8.    Lujan does not know the true names and capacities of the Defendants named in this action as Does 1 through 20, inclusive, and therefore sues them under fictitious names. Lujan will amend this Complaint to state the names and capacities of these fictitiously named Defendants when Lujan ascertains them.  Lujan is informed and believes, and on that basis alleges, that these fictitiously named Defendants are legally responsible in some manner for the acts and omissions set forth in this Complaint and are therefore liable to Lujan for the relief requested.

9.    At all times mentioned in this Complaint, unless otherwise stated, Defendants Girardi and LippSmith and Does 1 through 20 were the agents, servants or employees of each other, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency, employment or representation, and with the knowledge, consent, ratification, or approval of each of the other.

10.    At all times mentioned in this Complaint, unless otherwise stated, Defendants Waibel, the J.L.H. Trust, Slater, Grant Thornton and Does 1 through 20 were the agents, servants or employees of each other, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency, employment or representation, and with the knowledge, consent, ratification, or approval of each of the other.

## GENERAL ALLEGATIONS

11.    Lujan is a lawyer and a member of the Guam bar.  Lujan has been a member in good standing of the Guam bar since 1980.  He is the senior partner in the law firm of Lujan Aguigui & Perez LLP.

*COMPLAINT*

12.     Lujan was born in Guam in 1947.  After dropping out of high school and serving honorably in the United States Army in Vietnam, Lujan obtained a bachelor's degree from the University of San Diego and later attended law school at the University of Notre Dame Law School, where at 33 years old, he received a J.D. in 1979.

13.     Lujan is one of the most successful trial lawyers in Guam.  He has conducted over 300 civil and criminal trials.  Lujan has won some of the largest multi-million dollar civil verdicts in Guam's history as well as been counsel in many civil actions resulting favorable settlements worth tens of millions of dollars for his clients.  Lujan is also one of the top criminal defense attorneys in Guam and enjoys an excellent reputation as a respected member of the bar, the legal community, and the community at large.  Lujan burnished his reputation in the litigation over the Estate of Larry L. Hillblom.

14.     On May 21, 1995, Larry L. Hillblom, the co-founder and former owner of DHL Worldwide Express, died in an airplane crash, leaving behind several pretermitted children and an estate worth hundreds of millions of dollars.  At the time of his death, Hillblom was a resident of the Commonwealth of the Northern Mariana Islands ("CNMI").  Junior was one of Hillblom's pretermitted heirs.  At the time of Hillblom's death, Junior was 11 years old.  In August 1995, Junior's guardian retained Lujan to represent Junior's interests in the Hillblom Estate.

15.     For the next seven years, Lujan actively prosecuted Junior's claim to a share of the Hillblom Estate, to the exclusion of almost everything else, at great personal and financial risk, against much larger and well-financed opponents, and at tremendous odds.  At the outset of the Probate, the lawyers for the Hillblom Estate, and certain DHL insiders (collectively the "Insiders") sought to prevent any of the Hillblom's pretermitted heirs, especially Junior, from receiving any portion of the Hillblom Estate.

//

//

//

**COMPLAINT**

16. Due principally to Lujan's involvement in the case, settlement negotiations were initiated with the Estate. Initially, settlement proposals from the Estate were very unfavorable. Lujan was able to persuade Junior's guardian *ad litem* to turn down unfavorable offers from the Estate which, under the circumstances, was difficult: Junior was living with his grandmother at the time on about $125 per month.

17. Lujan protected Junior's claims very aggressively. Lujan's prosecution of Junior's claim required him to give up the rest of his law practice, sell personal real estate at fire sale prices, and borrow money at exorbitant monthly interest rates to fund the litigation. Lujan needed to untangle a series of complex business ventures that the Insiders had made to gain control of the Estate's executor to try to prevent distribution of any of the funds of the Estate to Junior or the other pretermitted heirs. As a result of Lujan's advocacy, the court in the Hillblom probate proceedings appointed a special master to review these business dealings. Lujan was the attorney responsible for prosecuting the claims before the special master. In large part due to Lujan's efforts the special master found that the Insiders had "manipulated" and "misstated the Estate's assets" and attempted to "circumvent the decedent's will." In addition, the law firm for the Executor was removed as attorney for the Executor and Bank of Saipan, the Executor, was suspended as such subject to reinstatement only upon the Court's approval.

18. In addition to unraveling these business matters, Lujan had to contend with the efforts by the Insiders to destroy every bit of Hillblom's remaining hair or tissue, because any tissue sample would permit a DNA test that could be used to prove paternity. When Lujan's legal team won the right to inspect Hillblom's house, he hired Dr. Brad Popovich, a DNA forensic expert, and Peter Barnett, a forensic investigator, who found it had been scrubbed clean with bleach and acid, confirming Lujan's suspicion that muriatic acid had been used to rid the plumbing of any and all traces of DNA. When Lujan's legal team won the right to inspect the plane crash site, they found that it had also been scrubbed clean with bleach and the airplane's seats had been removed. Because of the Insiders's efforts to hinder the establishment of paternity, and in the absence of available DNA, Lujan was forced to hire

COMPLAINT

attorneys Barry Scheck and Peter Neufeld, well known experts in the field of forensic DNA work. Through their efforts, including, for the first time in the CNMI, the use of DNA testing among siblings to prove paternity, and under the leadership of Lujan, four of the heir claimants, including Junior, were proven to be Hillblom's heirs.

19.     Lujan also had to contend with the Insiders' successful lobbying of the CNMI legislature to pass a probate reform law which would retroactively disinherit every illegitimate child in the CNMI. Called the "Hillblom law," Lujan challenged the law's constitutionality in the CNMI Superior Court and the U.S. District Court. While this constitutional challenge was pending, the heirs and the named beneficiary of Larry L. Hillblom's will (the "Hillblom Foundation") continued to engage in settlement negotiations. By August 1997, the settlement negotiations had reached an impasse, with the Hillblom Foundation offering the heirs 40% of the estate and the heirs' representatives holding out for 50% of the estate. The day before the hearing on the constitutionality of the Hillblom law, the Hillblom Foundation agreed to enter into a settlement agreement granting the four children, including Junior, 60% of the estate, all in order to get Lujan to agree to the settlement.

20.     Throughout Lujan's representation of Junior's interests in the Hillblom Estate, his conduct -- and the conduct of the guardians and guardians *ad litem* -- were supervised by two court proceedings:   (1) a guardianship proceeding in Guam Superior Court, Guam Juvenile Special Proceedings Case No. JP 0624-95 (the "Guardianship Proceeding"), and (2) the probate of Hillblom's Estate in the CNMI, C.N.M.I. Super. Ct. Case No. 95-626 (the "Probate Proceeding").

21.     During the course of the Guardianship and Probate Proceedings, the Probate Court reviewed and issued an order approving Lujan's fee agreement with the guardians *ad litem*, and the Guardianship Court reviewed and issued orders approving Lujan's fee agreements with the guardians *ad litem* and with the J.L.H. Trust. Junior's grandmother, who was also his co-guardian and co-guardian ad litem, signed one of the retainer agreements and joined in the petition to approve the other. Junior's mother, Kaelani Kinney, was almost always unavailable to attend and participate in court proceedings. The Guardianship Court

required that all payments by the J.L.H. Trust to Lujan be reviewed and approved by the Court. Thereafter, the Guardianship Court reviewed and issued orders approving accountings of the income and expenses of the J.L.H. Trust, including payments to Lujan for his attorneys' fees and expenses incurred in representing Junior's interests.

22.     In 1998, Lujan executed a retainer agreement with Junior's court-appointed co-guardian and co-guardian ad litem, Naoko Imeong (the "1998 Retainer"). In the 1998 Retainer, after a settlement was reached between the co-guardians and co-guardians *ad litem*, the parties agreed that Lujan and his co-counsel would receive 38% of Junior's recovery from the Hillblom Estate. Lujan sought and obtained approval of the 1998 Retainer from the Guardianship Court. Lujan's portion of such percentage fee was, after deductions were made for the fees and costs paid to Barry Scheck and Peter Neufeld, less than 14%

23.     To receive funds from the Hillblom Estate, the Probate Court set certain standards to be followed for the heirs' trusts (including the J.L.H. Trust). Junior settled the J.L.H. Trust in April, 1999, which the Guardianship Court approved on April 12, 1999, and also approved Defendant Keith A. Waibel, who was independently represented, as Trustee. The Trust gave the Trustee broad discretion to invest the Trust funds. To protect against abuse of these powers, the Trust appointed "Protectors" who had the authority to approve the actions of Waibel as Trustee.

24.     For the next several years, Lujan worked to maximize Junior's 15% share of the Hillblom Estate assets. In April 2000, the litigants in the Hillblom Estate Case entered into the Global Settlement Agreement. On April 7, 2000 the Probate Court approved the Global Settlement Agreement and Final Distribution of Estate Assets and Liabilities, which effectively terminated the Probate Proceedings. Thereafter, and until Junior reached majority, the Guardianship Court required that all payments by the J.L.H. Trust to Lujan and the other counsel be reviewed and approved by that Court. Thereafter, the Guardianship Court reviewed and issued orders approving accountings of the income and expenses of the J.L.H. Trust, including payments to Lujan for his attorneys' fees and expenses incurred in representing Junior's interests.

Case 1:09-cv-00017   Document 1   Filed 06/02/09   Page 16 of 25

25. Lujan continued to work to maximize Junior's distribution from various other assets distributed to the J.L.H. Trust pursuant to the Final Decree in the Probate as well as other assets placed in a liquidating trust for the benefit of all of the beneficiaries of the Estate. Thus, instead of the structured settlement the Estate had offered Junior to settle his claims, as a direct result of Lujan's efforts Junior received tens of millions of dollars more in cash and non-cash assets from the Estate.

26. In addition to Lujan's work in maximizing Junior's share of the Hillblom Estate, Lujan prosecuted and defended other lawsuits arising out of the probate proceedings, including an action against the Executor's former law firm, which resulted in a settlement, which benefited Junior tremendously.

27. Lujan and his co-counsel, Barry Israel and Joe Hill entered into an Amended Retainer Fee Agreement with the J.L.H. Trust to continue to represent the Trust's interests after the settlement and final distribution of the Hillblom Estate in exchange for an increased contingency fee of fifty-six percent (56%) (the "1999 Retainer"). Lujan's portion of such contingency fee was 26%, or less than half of the fees associated with post-final distribution efforts to increase Junior's share of his father's Estate. Waibel, as a Trustee of the Trust, voluntarily and without coercion entered into the 1999 Retainer. The Estate, including cash and non-cash assets, was distributed on or about April 30, 2000, with Junior's share being distributed to the J.L.H. Trust. However, certain receivables of the Estate that were to be paid prospectively were distributed to a Liquidating Trust, formed for the purpose of distributing said receivables to the beneficiaries of the Hillblom Estate.

28. Lujan presented the 1999 Retainer to the Guardianship Court for its approval. Plaintiff's co-guardian, Naoko Imeong, filed a petition joining in the application for approval. Ms. Imeong was represented by her own counsel, in her joinder. On September 12, 2001, the Guardianship Court entered an order approving the 1999 Retainer.

//

//

29.     On October 18, 2001, the J.L.H. Trust held a "Protectors Meeting" in Guam at which all of the trust income, assets and expenses were openly discussed. Waibel informed the Protectors and others in a written report about the new contingent-fee agreement with Lujan and Israel. Waibel praised the attorneys for their work representing Junior's interests. Indeed, as a direct result of Lujan's efforts Junior received a distribution of tens of millions of dollars in cash and non-cash assets from the Estate and the Liquidating Trust.

30.     In October 2002, after Junior had turned 18, the Guardianship Court approved Waibel's accounting of the J.L.H. Trust, his written report of the Trust, and an independent audit of the Trust, performed by Michael Tomita, a certified public accountant.

31.     Upon information and belief, Waibel invested the money distributed to the Trust from the Hillblom Estate. Instead of prudently investing the Trust funds, Waibel made unwise and imprudent investments. Upon information and belief, during the period 2000-20001, Waibel invested in a number of risky high-tech and start-up ventures, from which the Trust suffered tremendous losses.

32.     Plaintiff is informed and believes that Waibel made investments without consulting the Protectors and without first obtaining their approval.

33.     Plaintiff is further informed and believes that Waibel used the Trust assets for his own personal gain, including purchasing for himself one or more, expensive, foreign-made cars.

34.     Also on information and belief, Plaintiff alleges that Waibel commingled his own and his family's funds with those of the Trust and made joint investments with the Trust, which was a conflict of interest and breach of his fiduciary duty to the Trust and its principal beneficiary, Junior.

35.     Plaintiff is informed and believes that in 2006, Waibel also made unwise and imprudent investments in real estate in Hawaii and elsewhere without conducting adequate due diligence on the investments, again causing Junior's Trust tremendous losses in excess of $1.5 million. Plaintiff is further informed and believes that Waibel personally co-invested with the Trust in a risky start-up – a business call center in the Philippines.

36.    Upon information and belief, in an effort to deflect attention from the losses he caused the Trust, Waibel, Slater and Grant Thornton, in cooperation with Does 1 through 20, developed a scheme to blame Lujan for the poor state of the Trust. In furtherance of this scheme, Waibel invented the story that he was "coerced" into signing the 1999 Retainer by Lujan and Israel, because they allegedly threatened to "fire" him as Trustee unless he signed it. In or before 2006, Waibel schemed with Does 1 through 20 to cause the Trust not to pay Lujan funds he was due under one or both of the Retainers. Waibel, Slater, Grant Thornton and Does 1 through 20 created accountings to try to get Lujan to forego his right to receive payment due under the Retainers and to coerce him to pay millions of dollars to the Trust, thereby covering up Waibel's investment losses and saving his lucrative position as Trustee of the Trust.

37.    Apparently not satisfied with the tens of millions of dollars earned for him by Lujan's efforts, or dissatisfied with how the funds and assets of the J.L.H. Trust were invested and managed, on February 3, 2009, Junior through his attorneys, Defendants LippSmith and the law firm of Girardi | Keese, filed a Complaint in the U.S. District Court for the Central District of California for damages against Lujan, Israel and Waibel, alleging in part that Lujan had committed legal malpractice. Junior filed a First Amended Complaint in the California Action on April 22, 2009. Lujan denies the allegations of the First Amended Complaint. A copy of the First Amended Complaint, purely by way of setting for the fact that claims have been made against Lujan in the California Action, is appended hereto as **Exhibit A.**

38.    The Complaint challenges (1) the 1999 Retainer entered into by the J.L.H. Trust with Lujan and his co-counsel while Plaintiff was a minor, which allegedly superseded the 1998 Retainer entered into by Plaintiff's guardians with Lujan and his co-counsel; and (2) the amount of the fees and costs paid to Lujan and co-defendant Israel pursuant to the 1999 Retainer, which Junior claims were "unsubstantiated."

39.    Although Waibel is named as a defendant in the California Action, Plaintiff is informed and believes that Waibel actively cooperated with Junior in the months leading up to the lawsuit by personally writing demand letters to Lujan and Israel. Waibel stands to lose

*COMPLAINT*

1   nothing in the California Action, because on information and belief he will be indemnified for
2   all of his legal fees and any judgment against him by the Trust and Junior.

3       40.    Plaintiff is informed and believes that Waibel has intentionally caused the Trust
4   to breach the terms of the Retainers. Plaintiff is further informed and believes that within the
5   last year, the Trust received a substantial amount of money in federal tax refunds from the
6   Internal Revenue Service. By the terms of his Retainers, Lujan is entitled to a percentage
7   share of this tax refund. Plaintiff is further informed and believes that Waibel has also caused
8   the Trust not to pay Lujan his share of several million dollars received by the Trust following
9   final distribution of the Hillblom Estate as a result of Lujan's work for the Trust. By virtue of
10  the court-approved Retainers, Lujan has a vested interest in these funds. The Trust's failure to
11  perform its obligations under one or both of the Retainers by paying Lujan his contingent-fee
12  share constitutes a breach of these agreements. In addition, the Trust received other money
13  from the sale of Bank of Saipan shares at a price of a minimum of $2 million and received
14  state tax refunds to which Lujan is entitled a share under the Retainer Agreements.

15      41.    After the Complaint was filed in the California Action, LippSmith voluntarily
16  spoke with a reporter at KUAM News, a news network on Guam, about Junior's lawsuit. In
17  the course of that interview, LippSmith made out-of-court statements about the lawsuit that
18  were later published on the KUAM News website and broadcast on local news stations in
19  Guam and played in the CNMI.

20      42.    In the interview, LippSmith falsely and maliciously described the details of the
21  lawsuit, stating that Lujan had "stolen money" from Hillblom and "conspired" with the other
22  defendants in the Junior case to "increase the contingency fee agreement to ensure that they
23  would receive a large portion of Junior's trust under the guise of attorney's fees and
24  compensation."

25      43.    In the interview, LippSmith falsely depicted Lujan as one who would take
26  advantage of his clients. In referring to Lujan, LippSmith opined that, "[t]here's something
27  fundamentally wrong in [his] mind and disappointing to learn about other lawyers who end up
28  taking more money than their clients." LippSmith further stated that, "it speaks volumes about

*COMPLAINT*

what level of importance [attorneys] place themselves above their own clients." LippSmith falsely implied that Lujan greedily runs his practice at the expense of his clients. LippSmith never mentioned in the interview any of the facts set forth above regarding Lujan's zealous advocacy to maximize Junior's interest in the Hillblom Estate, or his fee agreements having been reviewed and approved by the Guam Superior Court and the CNMI Superior Court, or the Guam Superior Court's review and approval of the J.L.H. Trust's final accounting of the fees Lujan received. As a result of these statements, LippSmith defamed Lujan in his trade, business, and profession. These statements were intentionally directed toward Guam and the effects were felt by Lujan in Guam.

## FIRST CLAIM FOR RELIEF

Defamation
(Against Defendants Girardi | Keese, LippSmith and Does 1 through 20)

44. Plaintiff repeats and realleges paragraphs 1 through 43 above, as though fully set forth in this cause of action.

45. All of Defendant's LippSmith statements were false and defamatory *per se*, and generally injured Lujan's reputation in his trade, business and profession, for which Lujan seeks damages according to proof.

46. These statements clearly expose Lujan to hatred, contempt, ridicule and obloquy because they charge Lujan with dishonesty.

47. As described above, these statements were published in the media to various persons in places where Lujan resides and normally conducts his business and profession.

48. In performing the foregoing acts, LippSmith and the Girardi firm acted falsely, maliciously, fraudulently and oppressively, thus entitling Lujan to punitive damages by way of punishing these Defendants and making an example of them.

//

//

COMPLAINT

49. The Girardi firm, LippSmith and Does 1 through 20, and each of them, entered into a contract or conspiracy to defame Lujan. In furtherance of their conspiracy, the Girardi firm, Lippsmith and Does 1 through 20, and each of them, caused the above alleged statements to be made and disseminated and caused other false and defamatory statements to be made and disseminated.

50. As a result of the conduct of the Girardi firm, LippSmith and Does 1 through 20 alleged in this cause of action, Lujan has suffered damages in an amount to be proven at trial.

51. The conduct of the Girardi firm, LippSmith and Does 1 through 20 as alleged in this Complaint was done willfully and with oppression, fraud or malice in conscious disregard of Lujan's rights, thus entitling Lujan to punitive and exemplary damages against them in an amount sufficient to punish them and make an example of them.

## SECOND CAUSE OF ACTION

Intentional Interference with Contract
(Against Defendants Keith A. Waibel, Roger Slater, and Grant Thornton)

52. Plaintiff repeats and realleges paragraphs 1 through 51 above, as though fully set forth in this cause of action.

53. Defendants are and at all relevant times alleged in this Complaint were aware of the existence of the Retainers. Defendants are not parties to the Retainers.

54. Defendants have intentionally induced the Trust to breach the Retainers.

55. As a consequence of the conduct of Defendants, Lujan has suffered damages.

56. The conduct of Defendants was fraudulent, malicious, and in conscious disregard of Lujan's rights under the Retainers, thus entitling Lujan to punitive damages against them as a way to punish them and set an example of them.

//
//
//

# THIRD CAUSE OF ACTION

### Aiding and Abetting
### (Against Defendants Keith A. Waibel, Roger Slater, and Grant Thornton)

57. Plaintiff repeats and realleges paragraphs 1 through 56 above, as though fully set forth in this cause of action.

58. Defendants Waibel, Slater and Grant Thornton know that the Trust's refusal to perform the Retainers constitutes a breach of duty to Lujan.

59. Defendants Waibel, Slater and Grant Thornton have given the Trust substantial assistance or encouragement to refuse to perform the Retainers. In particular, Defendants Waibel, Slater and Grant Thornton have wrongfully encouraged the Trust not to pay the amounts due and owing Lujan under the Retainers in order to coerce Lujan into foregoing the amounts he is owed by the Trust and settling non-existent claims against the Trust in order to cover up and divert attention from Waibel's incompetence and investment losses on behalf of the Trust.

60. Defendants Waibel, Slater and Grant Thornton have committed tortuous acts in concert with the Trust or pursuant to a common design with the Trust. The conduct of Defendants Waibel, Slater and Grant Thornton, separately considered, constitutes a breach of duty to Lujan by each of them.

61. Defendants Waibel, Slater and Grant Thornton are therefore liable to Lujan for all harm resulting to Lujan as aiders and abettors of the Trust's breach of its duties to Lujan.

# FOURTH CAUSE OF ACTION

### Contribution
### (Against Defendants Keith A. Waibel and Does 1 through 20)

62. Plaintiff repeats and realleges paragraphs 1 through 61 above, as though fully set forth in this cause of action.

63. Lujan is not liable to Junior in the California Action. Junior's alleged damages, if any, were caused by Waibel or Does 1 through 20.

COMPLAINT

64.     As a consequence, if Lujan is found liable for any or all of the claims against him in the California Action, he is entitled to contribution from Waibel and Does 1 through 20 in proportion to his actual fault.

## FIFTH CAUSE OF ACTION

Equitable Indemnification
(Against Keith A. Waibel and Does 1 through 20)

65.     Plaintiff repeats and realleges paragraphs 1 through 64 above, as though fully set forth in this cause of action.

66.     Lujan is not liable to Junior in the California Action. Junior's alleged damages, if any, were caused by Waibel or Does 1 through 20.

67.     Because the cause of Junior's alleged damages or injuries in the California Action are due to the conduct of Waibel and Does 1 through 20, Lujan is entitled to equitable indemnification by Waibel and Does 1 through 20.

## SIXTH CAUSE OF ACTION

Breach of Contract
(Against Defendants Keith A. Waibel and the J.L.H. Trust)

68.     Plaintiff hereby incorporates and re-alleges paragraphs 1 through 67 above as though fully set forth in this cause of action.

69.     The 1998 Retainer and the 1999 Retainer are valid and existing contracts.

70.     Plaintiff has performed all of his obligations under the 1998 Retainer and the 1999 Retainer or non-performance has been excused.

71.     Defendant Waibel and the J.L.H. Trust have breached the 1998 retainer and the 1999 Retainer by failing to pay the amounts due and owing Lujan under those contracts.

72.     As a result of Defendants Waibel's and the J.L.H. Trust's breach of contract, Plaintiff has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lujan prays for damages against Defendants as follows:

1.  For general damages according to proof at trial;

2.  For special damages according to proof at trial;

3.  For punitive and exemplary damages;

4.  For an order, judgment, declaration and decree of contribution according to actual fault and equitable indemnification;

5.  For Plaintiff's attorney's fees and costs incurred in bringing suit; and

6.  For such other and further relief as the Court may deem just and proper.


DATED this 11th day of May, 2009.

> CALVO & CLARK, LLP
> Attorneys at Law
> *Attorneys for Plaintiff*
> David J. Lujan
>
> By: _____
> Eduardo A. Calvo